Mr. Stein, it looks like he gets to go first. Yes, Your Honor. Thank you. It pleases the Court. My name is Larry Stein. I'm here with Sherry Oyemi, and we have the pleasure of representing Mar-Jac Poultry in this OSHA case. It started off with a tragic accident. Unfortunately, the individual was severely intoxicated and was positive for alcohol, THC, and meth. The meth was so large that the toxicologist report said he was either leucogenic. But the fundamental question really here is whether 1910.212.A1 is a performance standard because the Court's precedence under BB and insulation and S&H rigors basically said there's a certain standard that you have to use when there's a performance standard. So the first thing I want to address is that particular issue. The first thing is the administrative law judge below in the decision noted that it was a performance standard on page 8 of the decision. The Review Commission from the very beginning has called 1910.212 the General Machine Guarding Standard. Their case is from the 1970s when OSHA first got started. They started issuing citations in 1973 that it was called the General Machine Standard. If you look at the title of the 1910, which is found in subpart O, which is Machines and Machine Guarding of the OSHA regulations, its title is General Requirement for All Machines. And the standard says it is one or more methods of machine guarding shall be provided to predict the operator and other employees in the machine area from hazards. And then it goes such as in a list of examples. It doesn't define every hazard. It just gives a list. And then it goes on and says examples of guarding methods are barrier guards, two-handed tripping devices, electronic safety devices, et cetera, which means there are more machine guarding issues than that. The language, just by looking at the very language of the regulation, shows that it's incredibly general. It applies to all industries, to all machines, to hazards undefined. That is as generalized as it can get. The Lattice Company Review Commission said the cited standard is generally applicable according to the terms to hazards presented by moving parts of all types of industrial machinery. And the Review Commission of the mining industry also said it's a general industry standard and a performance standard. And the very language of it doesn't tell you what to do or how to do it. It just says you've got to protect hazards. So under those circumstances, we are left with B&B and S&H records. And in that case, the burden on the secretary is to demonstrate that the employer, first they've got to demonstrate what the industry practice is for that particular piece of equipment, which is an eviscerator, which is used to take out the guts of a chicken. It removes the eviscera. And then once you determine what the industry standard is, did the employer comply with the industry standards? What do you do with Echo Power Line, which seems to have a, which is after the two cases, S&H records, and, you know, when you rely on, it does seem to show a reluctance to go the direction that you're going, perhaps finding this Part 212 sufficiently clear, at least at the level necessary to make this decision. There may be some other industry standards would be relevant beyond the violations that were occurring here. But insofar as the violations that were found here, industry standards would be irrelevant under Echo Power Line. Help me understand why that's not so. The difference between Echo Power Line standard and this standard is first thing is it's found in subpart V, which is electrical power transmission. So it's limited to one industry, Your Honor, one. Not every industry, one industry. Well, it's limited perhaps in Echo Power Line to what, that was the issue. It seems the case is talking more broadly about performance standards. Well, yes, Your Honor, however, Echo Power Line also basically said that it still applies the B&B and the S&H to generally worded statements applicable to all workplaces. And 19.10.2.12 is applicable to all workplaces and it is generally stated that way. So even the quote out of Echo Power Line where it says that, it still goes back to that point that it's still the concept of a generally worded standard applicable to workplaces. And then in the other decision, in the Karboska case, Inc., it's still called the 19.26.105 standard. It called it a general industry standard also. Different analysis, but one that's still applicable to this case. So in that case, the Fifth Circuit, and that's a 1991 case, so it's after Echo Power Line, was looking at the standard 19.26.105A and the standard there, what they said was, put another way, the secretary has the burden to prove that Karboska had actual constructive notice that section 105 required it to install a safety net. So in that particular case, now they're looking at 19.26.105A. And in 19.26.105A, what they were trying to, excuse me, they were looking to see whether there was enough notice. And they did find there was enough notice because they found a lot of case law that defined 19.26.105A to do it. However, in that case, what they said is, here's the things you need to look at. You need to look at the industry custom and practice. Now, the secretary put on no evidence to the industry custom and practice. We put on evidence, we brought in the former area director for OSHA for Mississippi for a couple of years, Clyde Payne, and had him as an expert. And he testified that he had extensive experience in the industry and that the use of the safety trip wire was what the industry did for the evisceration. Also, the next thing they said to look at is the injury rate for that particular piece of equipment. The testimony was, and it was unrebutted testimony, that MARJAC had suffered no injuries at all on the eviscerators. The two USDA inspectors who were in the Poultry places and other places besides MARJAC testified they'd seen no injuries on an eviscerator. These eviscerators were installed at your company's plant in 2014. When did the injury occur? Around that time. When did the injury occur? What year? The day after the occur? I'm trying to remember the exact date, Your Honor, because it's been so long. Not exact date, just what year. About 6 years later, 2021. Counselor, about the cord, some of the photographs show the cord, I guess about waist length, but the exhibits in particular show the cord much higher, like 72 inches, much higher. Where was it at the time of this incident? 72 inches, Your Honor. 72 inches, okay. Your Honor. And you're saying that that was the standard, the industry standard at the time? Not only is it the industry standard, but also it's a standard in 1910 for machine guarding, which is in some part of the same standard. There's another standard 1910-16. And in 1910-16, they're talking about guarding mills and calendars, and they say that you can guard those with safety cords, no more than 72 inches above the floor. So there's an OSHA standard, a very specific standard, just four standards down in the subpart O, which is the machinery and machine guarding, that says the very type of guarding that we use, OSHA says you can use for mills and calendars. Not only is that important, but if you look at 1910-212, and you look at the A-3 list, it lists the number of pieces of equipment, and it lists mills and it lists calendars. Those are the very specific pieces of equipment listed in 1910-216, so there is a very specific provision there. Well, my expert also went on to the OSHA site to look to see if there was any instruction, and this is really important compared to the Cobosco case, because he testified unrebutted, and it's still on the webpage, OSHA put nothing in their entire webpage, no interpretations, nothing, as to how to guard an eviscerator. So there's nothing on the OSHA, there's no decision ever rendered. OSHA doesn't give you any interpretations or cases, which makes a distinction between this case because in the Cobosco case, which was 1926-105, there's instructions to use a safety net so that the employer could go and read these cases and be provided sufficient due notice to comply with it, which is what this case is about, this lack of notice, and we use the exact thing. The other thing, Your Honor, is the Secretary of Labor, in her brief, specifically states and cites a case and this is on their appellate brief, docket 2436, brief of 24, in doing so, the employer guarding method must conform with, quote, standard either published or incorporated by reference in 29 CFR, part 1910, Stacy Manufacturing Company. That's a direct cite from their brief. Well, in 1910-16, the method that we use is the same method that OSHA recommends for guarding bills and calendars. So if you're following the argument from the appellee that we must look at a standard that is referenced in the 1910 standards and draw your attention to 1910-16, which specifically says it and allows it and specifies 72 inches, no more than 72 inches. So we had the safety cord at a place in which OSHA said, the Secretary references we lowered it. Well, the compliance officers came in and said they thought it was too high. Well, we're not going to argue with the compliance officer. We lowered it because . . . Counsel, let me ask also. Yes, sir. You opened your remarks commenting on substances in the decedent's bloodstream, suggesting that he may have been impaired at the time. Was there any testimony, either expert testimony, about the level of impairment or more particularly fact witness testimony that this gentleman was doing something particularly dangerous, particularly out of the ordinary, risky, beyond what his normal job was? Your Honor, there was a toxicology report submitted from the court. Right. And in the toxicology report, it listed the levels of THC, alcohol, and meth. Counsel, would you get more behind the microphone? Sorry, I didn't realize what I did. We don't want to lose your words for posterity. Yes, Your Honor. So the meth level was 250 nanograms, Your Honor. The coroner in the toxicology report dropped a footnote, and it's in the record, that at that level they're hallucinogenic or psychotic. 25 nanograms is enough to get you intoxicated. So the problem is this man came in and he was severely intoxicated. We don't know how he got into the machine. Nobody observed it. We don't know whether he pulled in or fell in or passed out and fell into the machine. We just don't know. The record really doesn't have anything in it. The ALJ referred to that. However, it's really no eyewitnesses to say so, and just to see a photograph is not enough to surmise how he was pulled in. And the final thing on this lack of due process that I would like to raise is the citation, basically, that OSHA gave us said, in the operative language, the fact part, which is the important part in the citation, the employee allowed employees to routinely place hands, and this is the critical word, below the rotating carousel of the eviscerator to remove chicken parts. Well, the judge specifically made a finding in the decision at 10 and 11 that there was no zone of danger in that area. She then, Suspante, after the decision, without amendment and after the decision was rendered, changed it so that the zone of danger was above the point when, in fact, the citation that we received was below the rotating carousel. What is the evidence? There's a statement from John, I think it's John Connor, the co-worker who was there that night, that said that night he had removed 10 chickens from an eviscerator, maybe not the same one. What is the evidence of whether, of how often the chickens were removed below in what you just pointed to? At least for a while, the ALJ said this was not the zone of danger. What is the evidence on how often the chickens were being removed from that lower area, below the moving parts, and how often they were being removed from someplace closer to the carousel? The testimony was contradictory on that, Your Honor. Is not what? Contradictory, the testimony was contradictory. Our people testified that they were not doing that. Mr. Connor, with a statement that was put in, with the exception of the hearsay rule, said that he'd removed it. The viscera, if you look at the photographs and the video, you'll see hangs into that lower area. The viscera comes up. The viscera drops into a cup, and sometimes it drops below that, in that area between the pan and the rotating carousel. The last statement Connor makes in his statement is that the deceased was not trained to use that machine. Is there other evidence? No, the evidence is contrary. Basically, the position that the individual held was floor person. The floor person job was not an operator of this equipment. Well, let me stop you there. Did the AOJ at all rely on the possibility that the deceased was not trained on the machine? No, Your Honor. Okay, that's enough. Your time is up. Thank you. Yes, Your Honor. Thank you. Thank you, Your Honors, opposing counsel. Good morning, and may it please the court. Lenita McWilliams for the Acting Secretary of Labor. The dangerous nature of the eviscerator machine at Marjack's plant is in its name. By allowing its employees to work on this unguarded machinery where safety signs were noticeably absent, Marjack exposed its employees to the very hazards that OSHA sought to protect them from. Yet Marjack claims that it does not have to comply with OSHA's cited standards because it's not industry custom to guard the machine's rotating carousels, and it's not industry custom to post safety instruction signs. This presents a very slippery slope that would eviscerate the purpose of the OSH Act. Let me ask you about the signage itself. There's at least the argument, and you can confirm it or not, that no company had been... You can correct me, but as I recall, the argument is that no company had been sanctioned, at least as significantly as happened here, for the absence of signs on an eviscerator or something similar. And just practically speaking, it seems to me the training that the employees got made the signs almost superfluous. Knowing... And the machinery itself was by itself obviously danger, depending on where you put your hands or your body. You got any response to that? Yes, Your Honor. And so the OSHA standards often offer layers of protection. So while there is another standard applicable to the same hazard here, which is the unguarded machine, it makes neither standard more important than the other. So the safety instruction sign, it is an OSHA requirement, and it's just as important to comply with this standard as it is the machine guarding or any other standard that requires training. What is the fact that I'm not quite remembering about whether OSHA has penalized the absence of signs before? I'm sorry, can you repeat the question, Your Honor? I'm not quite recalling the position that Marjack has taken, but some argument that OSHA has not penalized for the absence of signs, at least on eviscerators, before. Your Honor, I can't speak to OSHA's citation of signs in other cases. That's frankly not an issue here. Well, it's an issue if this is an arbitrariness of the action by OSHA. If this is something that's not been a concern before and all of a sudden it is, and causation from the signs is maybe questionable if the court decides. I don't find it irrelevant. Well, OSHA has the authority to cite for violations of standards, and here it is clear that not only did Marjack not post the safety instruction signs in his plan, they were noticeably absent. And so where there's a violation, OSHA has the authority to cite, and that's exactly what OSHA did. That's just what the law says, and OSHA complied with the law. What standard or rule or guideline of OSHA do you think most that you can point to that most explicitly states a rule that was violated by the petitioner in this case? The cited standards here, Your Honor, the machine guarding standard, the safety instruction sign standard, its language, and also with the issue to notice, this Court's decisions in Echo Powerline is controlling, and also the Commission's decision in Laddish which specifically states that the machine guarding standard itself is specific enough such that it doesn't require reference to industry custom and practice. And as I was saying before, Marjack claims that it does not have to comply with these standards because it's not industry custom, but if this Court were to require evidence of industry custom every time an OSHA standard granted the employer some flexibility, employers could then avoid complying with any OSHA standard by relying on the practices of their peers without any regard to safety, and this is not what Congress intended. And so I'd like to take us back to the issue of notice, which is the threshold issue in this case. And then after that, I'd like to address a few points that Marjack has raised related to the metal doors on an adjacent machine at their plant, whether the machine guarding standard requires the secretary to produce a feasibility showing, which it does not, and also the employee's conduct in this case. On the issue of notice, the cited standards here not only specify the hazards, but they also re-specify the abatement methods to comply. Therefore, these standards were sufficiently precise to provide Marjack fair notice of what OSHA required on their own without referring to industry custom. And unlike the Sixth Circuit case, Martin v. Miami Industries, which Marjack relied on in its brief, there are no unique circumstances here that would have otherwise deprived Marjack of fair notice. This court has only required proof of industry custom where a standard does not identify specific obligations. On the other hand, where a standard's language is sufficiently precise, additional evidence is not necessary. And so turning first to the machine guarding standard, not only has a commission held that is specific and lattish, but applying the law of this circuit would yield the same outcome. The machine guarding standard granted Marjack some flexibility to select the type of physical guard it would use, but it provided Marjack adequate notice for three reasons. Number one, the machine guarding standard's language instructs Marjack on specific compliance methods. For example, it says, guarding methods are barrier guards, two-hand tripping devices, electronic safety devices. It says examples are those things, which is part, I think, of what opposing counsel is relying on. This is a general potential department standard that says here are ways you can do it. And insofar as, and this is not an eviscerator regulation, this is machinery generally. And that's where industry standards might end up being relevant since all the regulations it's talking about are examples. Yes, and so these are examples, and this is a non-exhaustive list. But these examples are sufficient enough to put Marjack on notice of how it could physically guard its machine. Well, of some ways to guard it, not of all ways to guard it. Not of all ways, you're correct, Your Honor. Moving on, it seems like that matters. Insofar as they're being called to task, obviously a terrible situation occurred here. They're called to task for violating this rule when they had other ways that they were allegedly thinking were probably guarding the safety of the workers. It would be virtually impossible for the secretary to list every single method that it may contain. Understood. That's where performance standards come into play. Yeah, but the issue here is not whether it's a performance standard or whether it's a specification standard. The issue really is whether the standard's language is specific enough to notify the employer about what is required by the standard and how to comply. And here we satisfy both of those points. Not only did the machine-guarding standard specify compliance methods, it also specifies the hazard. It is clear that the goal here is to protect MARJAC employees in the machine area from hazards created by the eviscerator's point of operation, ingoing nip points, and rotating parts. And further, it specifies that OSHA requires physical guarding to abate the hazard because there are no other standards that apply in this case. The textiles and rubber plastic standard that MARJAC referred to are not applicable to the poultry processing industry. MARJAC must install a guard that prevents its employees from having any part of their body in the danger zone while the machine is operating. This requirement is spelled out in the standards language. And so, therefore, MARJAC did not have to guess whether machine-guarding was required for this instance or what was considered an appropriate guard. So moving on to the safety signage standard. The language in this standard provides specification for accident prevention signs that put MARJAC on notice for the same three reasons. Number one, it specifies a hazard. Number two, it specifies OSHA's posting requirement to abate the hazard. And it specifically instructs MARJAC on how to apply. The scope provision in this standard indicates that posting requirements apply to signs that intend to indicate and define specific hazards of a nature that may lead to accidental injury or death, as a hazard did in this case. And the cited provision presumes that failing to post signs where there is a need for general safety instructions and suggestions creates a hazard. The standard does not permit MARJAC to forego posting safety instruction signs, whereas machinery poses a serious hazard to its employee. And MARJAC did not have to operate in a crystal ball to know that this standard applied to its operations. Not only did MARJAC admit that removing material from its carousel by hand was dangerous, one glance at the machine in this plant was enough to show that MARJAC was out of compliance with this standard. And so, looking at the language of the two standards, it's clear that MARJAC had adequate notice of what OSHA required in this case. And the ALJ's decision is consistent with the laws of this Court. Counsel, what do you say is shown on the record, the same question I asked opposing counsel, about where the workers were reaching? Is it in the area below the carousel, going down to the pan or flat surface that's below that, or was it someplace else? And so the workers reach, they reach in the pan underneath the drip pan, and they also reach up further near the carousels. But it's still below the carousel in the area from the pan below to the carousel is where they're reaching, not into the carousel on the side. And so I think that, Your Honour, that would encompass what the Secretary alleged in the citation. Well, I'm asking, what does the evidence show happened? Where were these individuals reaching? So they were reaching into the pan beneath the carousel at the very bottom and near the eviscerator's routine. Which gets into the point about the ALJ at some point saying the zone of danger is not below the carousel. So the ALJ narrowed the zone of danger. So the ALJ disagreed with the Secretary that the entire length of the distance between the drip pan below and the carousels were not the zone of danger. The ALJ narrowed the zone of danger to the area that's just near the carousels. And we produced evidence that the employees were reaching into that zone of danger to remove entangled chicken enders and whole birds when they got stuck in the machine. I wish you'd addressed the question. My colleague, Judge Englehart, asked opposing counsel about the affirmative defense of the intoxication of amphetamines in the bloodstream. History at this plant, at least through the time of this accident, no other injuries from an eviscerator of this particular person had the substances in his blood. The toxicology report does have some indication of that level causing certain effects in a person. Why isn't that relevant? So the decedent's intoxication is not relevant here because it's not the decedent's conduct that caused the OSHA violation. It was Marjack's failure to guard the machine and post the safety instruction signs that caused the violation. So neither the decedent's conduct... So you're saying Marjack is not being penalized for the person's death. It's being penalized just because these operations were discovered. It almost didn't matter why the person died. If he died because he was intoxicated or because he was on amphetamines, it's sort of irrelevant to OSHA's determination. It's how this machine was being operated. I'm proposing that as... Is that my understanding of what you're saying? Yes, Judge Oak, but that is absolutely correct. So the decedent's manner is not at issue here. What matters is how employees were accessing this machinery, how they were using it and how they accessed the physical conditions that constituted the hazard. That is the focus of this case. Well, if the person who died did not die because of any hazard that was particularly serious, but it's because of his own intoxication, I'm not saying the evidence supports that. I'm just proposing this. It seems that fits into what kind of penalty at least would be imposed. I'm sorry, King? That might fit in at least into what kind of penalty would be imposed on Marjack since, at least absent that one incident, nobody had ever been hurt because of the way they were operating. So if I understand Your Honor's question... Well, I'm not sure I understand my question either. The basic point here is that no one had been injured by the machine before, and so what you say are very dangerous conditions, the Secretary does, and you're defending that, were not so dangerous that anybody had been injured. Then you have somebody with these serious intoxicants in his blood system gets injured. So at least I think that's a factor in how dangerous is this really so long as workers are paying attention. So even if no one had been injured, say the decedent in this case... Just an inspection. You came in and you saw all of this. Right, came in and saw the same conditions, had the same evidence except that no one died. OSHA would still cite a serious violation of this standard because we do not wait for an injury or an accident to occur to cite a violation. That is not the purpose of the OSHAC. The OSHAC in itself is preventative in nature. So the decedent's death in this matter would not change the way OSHA cited this case. But would the penalty change? Assuming OSHA did a random inspection and appeared on the premises and said, oh, we find these deficiencies that must be corrected, would the penalty change as opposed to what happened in this case? Or you're saying that would be consistent nonetheless? It would be consistent nonetheless, Your Honor. It's still a serious violation because if an accident were to occur, as it did in this case, it would result in death or physical injury. And it's clear based on the facts of this case that that was a possibility. And so I'd like to just briefly clarify a few points that Marjack has made regarding the evidence of the metal doors on the adjacent machine. And so the secretary did not state that the doors on this machine were appropriate under the machine guarding standard, and the secretary did not state that Marjack should have installed the same doors on the machine at issue. And Administrative Law Judge Calhoun also did not decide this issue because it was not before the commission then and it's not properly before this court now. The line to eviscerator where the fatality occurred was the subject of OSHA's inspection, and the adjacent machine was outside of the scope. The secretary only introduced this evidence to show the stark differences between the two machines that were plainly obvious. There was the presence of safety signs and doors on one machine that appeared more protective than the other. Also, I would like to address a point that Marjack made regarding to the secretary's evidence of industry custom and practice. The secretary actually did present evidence of industry custom and practice, although it's not required here. We have evidence from the operation manual which identifies the rotating parts hazards that exist on this machine. And more importantly, we have Marjack's own admission that employees reaching near these carousels to remove material, whether it be entangled innards or whole birds, is a hazard. That evidence is sufficient enough to satisfy that requirement in this case should the court find that it's necessary. Another point I would like to address on the issue of feasibility, it's not the secretary's burden to prove that it was feasible for Marjack to physically guard the machine's rotating carousels. Marjack must prove in feasibility as an affirmative defense. And in this case, Marjack waived that defense by failing to raise it before the ALJ below. And so in closing, the standards here provided Marjack fair notice of what OSHA required without referring to industry custom and practice. Requiring the secretary to wait for an industry consensus to enforce these standards would allow Marjack to continue ignoring OSHA safety mandates and endanger its employees as a result. When it comes to worker safety, the OSHA Act neither permits nor requires the secretary to take such passive action. Here there's substantial evidence of Marjack's noncompliance that unfortunately resulted in the loss of the life. The U.S. State DA inspectors and Marjack's own employees established that it was common practice for the employees to remove material from the carousels by hand without stopping the machine. And Marjack's failure to guard the machine and post the safety signs violated the Act, not the decedent's conduct and not the conduct of any other Marjack employee. These hazardous conditions in employees' regular access to them are dispositive. Given the facts, the secretary respectfully requests that this court deny Marjack's petition for review. If the court has no further questions, the secretary rests on her brief. Thank you. All right, counsel. Thank you. Your Honors, I'd like to make a few points. First thing is the secretary indicated that this had to be fully enclosed by referencing 1910 to 12A3. That's the standard that she's referring to. The important thing is if you look at the decision, the hazards that the judge indicated were catch points and rotating equipment. When you look at 212, there's point of operations, in-going nip points, rotating parts, flying ships, and sparks. But the decision talks about catch points and rotating equipment. She talked about it also cuts, but they just moved with the equipment. If you look at the plain language of A3, it's talking about point of operations guardings. And it says point of operations in this area will be guarded this way. Court didn't find point of operation guards. This idea that it has to be enclosed under 212A3 is misconstruing the very plain language of the standard which says point of operations. That's not what we got cited for. We got cited for rotating equipment and catch points. The other point I want to make about this vagueness is as I stand here today, you just heard the athlete say that they're not going to accept the guards that we had with the emergency cord. The doors were not guards. To this point, I still don't know what it is that we're supposed to do to guard this hazard. If that's not a performance standard, I don't know what it is. And a performance standard is very clear. Like in the Echo Power Lake, it said you had to use tension stringing operations in an industry, which meant you had to keep the power lines tight so that they wouldn't whip around and make contact. Very specific, very knowledgeable. The employer in Echo Power Lake knew exactly what they had to do. We don't. We don't as of right now. What is it we're supposed to do to guard this? As to her statement that OSHA would have come in during an inspection and cited this for this hazard anyway, it's contradicted by the record. Our expert went in and looked into the record to see how many times an eviscerator had been cited by OSHA, and the number of times the machine guarding standard had been used for eviscerations in poultry was this case and this case only. To sit here and state that they would have come in and cited us for that by just looking at it is just not true. How many examples did your expert find? He looked at every . . . He said he looked over 100 cases and could not find any citations. 100 cases of OSHA inspecting eviscerators. Yes, Your Honor. They're in poultry plants everywhere. There's eviscerators in every poultry processing plant that does processing and does the slaughter. They're in every one of them. We had had OSHA in the facilities before. They didn't cite us for it. It was this event that caused them to cite us for it. That was what triggered it because there is . . . No citations other than this one. No injuries, and that included the two USDA inspectors who worked in other facilities with eviscerators because they're a standard piece of equipment. So we have no record of any injuries with an eviscerator anywhere before, and yet it's supposed to be a zone of danger. The testimony of the zone of danger was so generalized, you don't know exactly where they put their hands. And it was very vague. The statement from Mr. Conner didn't specify that particular area. So we're sitting here with . . . which is clearly not a specific standard because if it was a specific standard, we would have known we had to put up a barrier guard. We don't know that. We put up something in 1910, 216 said we could, and that's what the industry did. And I would tell you we complied with the industry standard. We guarded the machine in accordance with the industry standard, and the sign is unnecessary because we did the guarding in accordance with the standards. And therefore, these citations should be dismissed and the enforcement denied. All right, Counselor. Thank you, Your Honor. Both for presenting your side of the issues for us. It was helpful in our understanding.